UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

JERRY CARTER,

     Plaintiff,                    Case No. 3:20-cv-484

vs.

CITY OF TROY, OHIO,             District Judge Michael J. Newman

     Defendant.

---

**ORDER: (1) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 45); (2) DIRECTING THE CLERK OF COURTS TO ENTER JUDGMENT IN FAVOR OF DEFENDANT; AND (3) TERMINATING THIS CASE ON THE DOCKET**

---

This is a failure-to-promote and retaliation case. Plaintiff Jerry E. Carter—57 years old at the time in question—alleges that his employer, Defendant City of Troy, Ohio ("City"), discriminated and retaliated against him in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, and the controlling Ohio retaliation provision, Ohio Rev. Code § 4112.02. Both sides are represented by counsel. This civil case is before the Court on the City's motion for summary judgment. Doc. No. 45. Carter responded (Doc. No. 53) and the City replied (Doc. No. 55). Thus, the motion is ripe for review. For the reasons that follow, the Court grants the motion.

## I.     BACKGROUND

### A.  Carter's Employment at the City

Carter was born on January 24, 1962. Doc. No. 50 at PageID 1166. He had previous experience in construction and maintenance, and was hired as a laborer in the City's Parks Department on August 22, 2005. *Id.* at PageID 1168. He is currently still employed in the same

position.  *Id.*  In 2007, Carter applied for a Light Equipment Operator ("LEO") position in the

Parks Department but did not receive the promotion.  *Id.* at PageID 1188.  By 2009, Jeremy Drake

had become the Parks Department foreman and was Carter's supervisor.  *Id.* at PageID 1285.

Thereafter, Carter sought a seventeen-cent ($.17) raise for getting a spraying license and was

refused the raise by Drake and the Parks Superintendent.  *Id.* at PageID 1285-86.  In 2014, Carter

applied for a lateral transfer to work as a laborer in the City's Street Department because it could

help his chances to get promoted to a Street Department LEO position.  *Id.* at PageID 1194.  He

ultimately withdrew his application for the position.  *Id.* at PageID 1197.  Carter claims that he

was falsely told by Jerry Mullins—the Street Department foreman—that if he transferred, he

would have to serve another probationary period again and he was concerned that he would be

fired.  *Id.*  Carter testified that there were instances of animosity between him and both Mullins

and Drake, such as Drake prohibiting Carter from using a certain type of machinery after Carter

had rotator cuff surgery in 2018 and Mullins repeatedly asking Carter when he was going to retire.

*Id.* at 1289; Doc. No. 49 at PageID 1021.

### B. Alleged Incident of Age Discrimination

On February 4, 2019, the City published an Internal Position Posting for an LEO position

in the Street Department.  Doc. No. 49-2 at PageID 1118.  The job posting listed what it described

as "a brief abridgment of the job qualifications[:]"

> Completion of secondary education; any combination of training, education or
> experience which indicates a basic knowledge of street maintenance methods and
> demonstrable ability to perform physical labor; possession of valid State of Ohio
> Class A Commercial Driver's License with tanker endorsement.  Operates tractor
> with 16' batwing attachment, Ventrac ditch mower, trimmers, chippers, 1 ton and
> 5 ton dump truck with snow plow, air hammer, lawnmower, front end loader,
> backhoe front and rear bucket, street sweeper, asphalt grinder, roller, rear loaded
> and automated waste collection trucks, leaf collection equipment, skid steer with
> asphalt grinder attachment, 4000 gallon brine truck, Dura-patcher, and other
> various street maintenance equipment, in performance of job duties and

2

responsibilities.   This includes digging ditches, loading trucks, pouring and finishing concrete, etc.

*Id.*

The job posting also stated that interested employees "must submit a written letter of request for consideration and a resume, including copies of all applicable certifications to the Human Resources Director."  *Id.*  The HR department would prepare job descriptions and postings with input from the union and foreman.  Doc. No. 49 at PageID 945.  The list of equipment in the job posting had been updated in December 2018 to add what Carter claims are pieces of equipment that "are not even operated by the LEO" because the pieces "are basic, non-technical equipment that require minimum experience and training to operate."  Doc. No. 17-1 at PageID 75.  The job posting also had a disclaimer noting that it may not contain the full description or list of equipment. Doc. No. 49-2 at PageID 1118.

Carter applied and interviewed for the LEO position along with three other individuals: David Brown, Dan Griffieth, and Branden Walters.  Doc. No. 49 at PageID 984; Doc. No. 50 at PageID 1208.  Carter had worked for the City's Parks Department for fourteen years when he applied, including six years of perfect attendance.  Doc. No. 50 at PageID 1202, 1208.  Carter submitted a complete application with a letter of request for consideration, a resume, and copies of his applicable certifications.  Doc. No. 49-2 at PageID 1131-42.  His application demonstrated that he completed secondary education, had a commercial driver's license with a tanker endorsement, and had experience with many of the relevant pieces of equipment.  *Id.* at PageID 1132-33.  Although Carter had not operated every piece of equipment on the job posting, Carter asserts that Mullins told him that he has "operated at least two-thirds" of the equipment required and that he "wouldn't have any problem with the rest of it."  Doc. No. 50 at PageID 1223.

3

Carter interviewed for the position on March 1, 2019.  Doc. No. 17-1 at PageID 74.  At the time of the interview, Carter was fifty-seven years old.  Doc. No. 26 at PageID 125.  Mullins sat in on the LEO interviews and asked some follow-up questions, but the interviews were conducted by Julie Morrison from the City's Human Resources Department.  Doc. No. 49 at PageID 942.  Mullins would make verbal recommendations to the Human Resources representatives about who to hire.  *Id.* at PageID 960.  As part of the interviews, Mullins and Morrison went over a checklist of equipment used in the Street Department.  *Id.* at PageID 943.  The checklist used in the interviews had some of the same equipment as the list in the job posting, but they were not precisely the same.  *Id.* at PageID 951.  The checklist had twenty-five pieces of equipment with which the City wanted the applicants to have experience.  Doc. No. 49-2 at PageID 1150.  Carter's interview checklist suggests that he had experience with thirteen of the twenty-five pieces of equipment.  *Id.* at PageID 1153.

Carter testifies that Mullins—during his interview—asked him how much longer he was going to work before he retired, and Carter responded, "I don't know, maybe five years."  Doc. No. 50 at PageID 1216-17.  Carter then states that Mullins replied, "if you make it that long."  *Id.* at PageID 1217.  Carter also asserts in his summary judgment opposition memorandum that "Mullins made several references questioning [my] date of retirement" prior to the interview.  Doc. No. 53 at PageID 1344.  In Mullins' deposition, he admits that he has asked Carter about his plans for retirement in the past.  Doc. No. 49 at PageID 1021.  Mullins explained that "[Carter] would bring it up that he wanted to retire[;] he wanted to retire early" and that Mullins would regularly ask retirement-eligible persons when they were going to retire as a general topic of conversation.  *Id*.

4

A fellow City employee, Walters—then twenty-four years old—also applied and was interviewed for the LEO position.[1]  Doc. No. 54-3 at PageID 1365.  Walters had been employed with the City as a laborer in the Street Department for approximately one year, had worked at a different municipality prior to the City, and had experience with twenty-three of the twenty-five machines listed for the LEO position.  Doc. No. 47 at PageID 764; Doc. No. 49-2 at PageID 1159.  Walters also had a tanker endorsement.  Doc. No. 50 at PageID 1208.  Walters submitted an application letter, but there is no evidence that he turned in a resume prior to his interview.  Doc. No. 49 at PageID 981, 1005.

The City does not dispute that Walters—a non-protected person under the age of forty—was promoted to the LEO position in March 2019.  Doc. No. 45 at PageID 739.  Mullins testified that Walters was the stronger applicant because he had more relevant experience than Carter and a greater "[a]bility to perform the work, since you need him to run all the equipment."  Doc. No. 49 at PageID 1015.  Mullins explained that those two things "outweigh [Carter's] record of attendance, discipline, education and seniority."  *Id.*

### C.  Reporting and Alleged Instances of Retaliation

After not receiving the LEO promotion, Carter timely filed an Equal Employment Opportunity Commission ("EEOC") charge on April 5, 2019 alleging age discrimination and received a Notice of Right to Sue on September 9, 2020.  Doc. No. 26 at PageID 123.  Carter claims that his supervisor, Jeremy Drake, thereafter retaliated against him because he filed the EEOC charge.  *Id.* at PageID 129-30.  Carter testified that he was "sure [Drake] was" aware that

---

[1] There was some discrepancy regarding Walters' age.  At times, Walters is referred to as being twenty-seven years old at the time he was promoted.  Doc. No. 45 at PageID 739.  At other times, it is stated he was twenty-four.  Doc. No. 53 at PageID 1341.  The record states that Walters was born on March 13, 1995, which would make him twenty-four years old when he was promoted in March 2019.  Doc. No. 54-3 at PageID 1365.  This distinction is immaterial for ADEA purposes and thus not a genuinely disputed material fact.

5

he filed the EEOC charge because "the City of Troy is not that big" and "people know everything, especially if you're a manager."  Doc. No. 50 at PageID 1251.  Carter also testified that he discussed the EEOC discrimination charge with Drake at a meeting held following the filing of his EEOC charge.[2]  *Id.* at PageID 1280-81.

Carter alleges four instances of retaliation.  First, he asserts in his opposition memorandum that in January 2020, nine months after the filing of his charge, "Drake retroactively lowered [my] performance evaluation scores […] on [my] 2018 and 2019 performance evaluations[] without any explanation."  *Id.* at PageID 1345.

Second, Carter contends that, after his EEOC charge, Drake gave him fewer "upgrade" and overtime hours than his younger peers.  Doc. No. 26 at PageID 129.  In January 2020, for example, there was a tornado near Troy that required cleanup by the City.  Doc. No. 48 at PageID 832-33.  Drake explained that there was an on-call list for emergency situations in which certain employees were given priority over other employees to be called for overtime hours.  *Id.* at PageID 833.

Third, Carter alleges that he was verbally harassed by Drake, or received one or more harassing texts from him, on three occasions after filing his EEOC charge.  Doc. No. 26 at PageID 129.  These incidents included, *inter alia*, (1) Drake using profanity in an August 1, 2019 text to Carter after he damaged grass during a job at the town amphitheater (Doc. No. 48 at PageID 857-58); (2) Drake giving Carter a verbal warning in October 2021 after Drake received a complaint from the police department about a mowing job Carter had done (Doc. No. 48 at PageID  845-46; Doc. No. 48-5 at PageID 918-19); and (3) Drake telling Carter on January 20, 2022 he was going to be written up for telling a coworker that "[Drake] wants to keep you happy" (Doc. No. 50 at PageID 1271).

---

[2] Carter's opposition memorandum states that this event occurred on January 21, 2020, but this is not confirmed by the record.  Doc. No. 53 at PageID 1344.

Finally, Carter contends that, following the filing of his EEOC charge, Drake required him "to do more physically taxing work than his peers." Doc. No. 26 at PageID 129. Carter testified that at one point[3] he "was taken off [his] regular job [he has] been doing for seven years"—running a Bobcat and doing tree work—and put on trash and restroom duty. Doc. No. 50 at PageID 1266. Carter testified that on January 4, 2022, he was sent to paint barrels, which he claims caused him to get headaches. *Id.* at PageID 1267, 1270. Carter's job title and pay did not change due to these reassignments. *Id.* at PageID 1266-67.

## II.     STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Id.* at 323; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). The moving party must either point to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *See* Fed. R. Civ. P. 56(c)(1)(A) and (B); *see also Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 788 (6th Cir. 2000) (stating that the moving party retains

---

[3] Carter's opposition memorandum states that this event occurred in August 2021, but this is not confirmed by the record. Doc. No. 53 at PageID 1345.

the burden of production, but "need not support its motion with affidavits or other similar materials 'negating' the opponent's claim, but need only show that 'there is an absence of evidence to support the non-moving party's case[]'" (citing *Celotex*, 477 U.S. at 323–25)).

Once a motion for summary judgment is properly made and established, the nonmoving party must then point to specific facts in the materials that indicate a genuine issue. *Morris*, 201 F.3d at 788. The nonmoving "party may not rely merely on allegations or denials in its own pleading." *Viergutz v. Lucent Techs., Inc.*, 375 Fed. App'x 482, 485 (6th Cir. 2010). Additionally, the failure "to properly address another party's assertion of fact as required by Rule 56(c)" could result in the Court "consider[ing] the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). However, the Court must believe the evidence of the nonmoving party and view all facts and inferences in the light most favorable to the nonmoving party. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

Finally, "there is no duty imposed upon the trial court to 'search the entire record to establish that it is bereft of a genuine issue of material fact.'" *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir. 1992) (citations omitted). Instead, "the free-ranging search for supporting facts is a task for which attorneys in the case are equipped and for which courts generally are not." *Id.* at 406.

### III. ANALYSIS

Carter raises three claims: (1) age discrimination in violation of the ADEA; (2) retaliation in violation of the ADEA; and (3) retaliation in violation of Ohio Revised Code § 4112.02. Doc. No. 26 at PageID 129-30. The City moves for summary judgment in its favor as to all claims. Doc. No. 37 at PageID 736.

8

### A. ADEA Age Discrimination Claim

Carter first alleges that he suffered age discrimination in violation of the ADEA when the City promoted a younger applicant instead of him. Doc. No. 1 at PageID 4. Under the ADEA, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The plaintiff has "the burden of persuasion to demonstrate 'by a preponderance of the evidence … that age was the "but-for" cause of the challenged employer decision.'" *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 806 (6th Cir. 2020) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009)). The plaintiff may present either direct or indirect evidence to meet this burden. *Id.* Here, Carter has not provided any direct evidence of age discrimination and relies, instead, on indirect evidence. *See* Doc. No. 26.

When a plaintiff relies upon indirect evidence of age discrimination, the age discrimination claim is "analyzed under the *McDonnell Douglass Corp. v. Green*, 411 U.S. 792 […] (1973), burden-shifting framework." *Willard*, 952 F.3d at 807. Under this framework, the plaintiff must first establish a *prima facie* case of age discrimination. *Id.* If the plaintiff has produced enough evidence that a reasonable jury could conclude a prima facie case has been established, the burden of production "shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action." *Id.* If the employer produces a sufficient reason, "the burden shifts back to the plaintiff to establish that the proffered [reason is] simply pretext for age discrimination." *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 887 (6th Cir. 2020).

Here, the City asserts that Carter does not satisfy his *prima facie* case of age discrimination. Doc. No. 45 at PageID 740. Even if Carter satisfies his *prima facie* case, the City suggests it has put forth one or more legitimate, non-discriminatory reasons for not promoting Carter and that he

cannot show the City's reasoning was pretextual. *Id.* at PageID 742-43. While Carter responds to the City's arguments concerning the *prima facie* case, Carter does not respond to the City's arguments regarding its supposed legitimate and non-discriminatory reasons or suggest those reasons are pretextual. *See* Doc. No. 53. For example, Carter does not mention the word "pretext" in his summary judgment opposition memorandum. *See id.* Additionally, Carter provides very little case law supporting his age discrimination claim generally, and no case law citations relating to pretext. *See id.* at PageID 1347-49. Accordingly, the Court questions whether Carter has abandoned his age discrimination claim and waived any argument concerning dismissal of the claim. *Hicks v. Concorde Career Coll.*, 449 Fed. App'x 484, 487 (6th Cir. 2011) (finding that "[t]he district court properly declined to consider the merits of [plaintiff's] claim because [plaintiff] failed to address it in... his response to the summary judgment motion").

Moreover, Carter cites the complaint on multiple occasions instead of citing the record to show critical facts. Doc. No. 53 at PageID 1336, 1340, 1344 (citing the complaint to show: (1) when Carter was hired by the City; (2) when Carter applied for a promotion; (3) that Mullins asked when Carter would retire; and (4) when Carter filed the EEOC charge). At times, Carter fails to cite anything at all. *Id.* at PageID 1348-49 (failing to cite to anything in the record for nine sentences describing the qualifications of Carter and Walters). The non-moving party cannot rest on the pleadings and cannot expect the Court to search the entire record for material facts. *Viergutz*, 375 Fed. App'x at 485; *Guarino*, 980 F.2d at 404. Thus, summary judgment on the retaliation claim is appropriate on this independent basis.

Nevertheless, to be careful and thorough, the Court will proceed to discuss the *McDonnell Douglas* framework. Having failed to satisfy his burden of demonstrating pretext, Carter's age discrimination claim must fail on the merits.

### 1. *Prima Facie* **Case of Age Discrimination**

To establish a *prima facie* case of age discrimination based on a failure to promote, Carter must show: (1) he is a member of a protected class; (2) he applied for and was qualified for the promotion; (3) he was "considered for and denied the promotion;" and (4) another employee of similar qualifications, who was not a member of the protected class, received the promotion. *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006). The City concedes that Carter satisfies the first and third prongs: he was a member of a protected class (as a 57-year-old) and he did not receive the promotion. Doc. No. 45 at PageID 741. Therefore, the Court examines the second and fourth prongs: whether Carter was qualified for the promotion; and whether another employee of similar qualifications received the promotion.

In order to satisfy the second and fourth prongs, the Court must examine Carter's qualifications for the promotion. *See Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011). The prima facie burden is intended "to eliminate the most common nondiscriminatory reasons for the employer's action." *Id.* at 813. A plaintiff's "burden at the *prima facie* stage is 'not onerous' and 'poses a burden easily met.'" *Id.* at 813 (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000)).

To satisfy the second prong, Carter must show that he was qualified for the LEO position in the Street Department. At the time Carter applied for the promotion, he had been working for the City for fourteen years. Doc. No. 50 at PageID 1208. Carter has demonstrated that he completed secondary education, had a commercial driver's license with a tanker endorsement, and had experience with many of the relevant pieces of equipment. Doc. No. 49-2 at PageID 1132-33. Although Carter had not operated every piece of equipment the City lists on the job posting, Carter asserts that Mullins told him he had "operated at least two-thirds" of the equipment required and

that he "wouldn't have any problem with the rest of it." Doc. No. 50 at PageID 1223. Viewed in the light most favorable to Carter, a reasonable trier of fact could find that he was qualified for the position for the purposes of satisfying the second element of the threshold *prima facie* case of age discrimination.

To satisfy the fourth prong of a *prima facie* case in a failure to promote claim, a plaintiff must show that (a) a non-protected person was promoted, and (b) the promoted person and the plaintiff had "similar qualifications." *Provenzano*, 663 F.3d at 814. The City does not dispute that Walters—a non-protected person under the age of forty—was promoted. Doc. No. 45 at PageID 739. However, the City argues that Carter and Walters did not have "similar qualifications." *Id.* at 739, 741-42; *see Provenzano*, 663 F.3d at 814. Carter is not required to establish that he and Walters "had the exact same qualifications." *See Provenzano*, 663 F.3d at 814. Instead, Carter is only required to show he has "similar qualifications to the employee who received the promotion." *Id.* (internal quotation marks omitted).

A comparison of Carter's and Walters' qualifications in the light most favorable to Carter reveals that Carter "presented sufficient evidence to permit a reasonable trier of fact to conclude" that he and Walters were similarly qualified for the LEO position. *See id.* Carter had been employed with the City in the Parks Department for fourteen years, had experience with around "two-thirds" of the machinery or skills needed for the LEO position, and submitted a complete application for the LEO position. Doc. No. 50 at PageID 1208, 1223, 1171; Doc. No. 53 at PageID 1348. By contrast, Walters was employed with the City in the Street Department for close to one year, had worked at a different municipality, had experience with twenty-three of the twenty-five machines or skills listed for the LEO position, and submitted an incomplete application for the LEO position. Doc. No. 47 at PageID 764; Doc. No. 49-2 at PageID 1159; Doc. No. 53 at PageID

12

1349. Both Carter and Walters had a tanker's license. Doc. No. 50 at PageID 1208. Although their qualifications were not the same and each candidate had separate strengths and weaknesses, a reasonable trier of fact could find that Carter and Walters were similarly qualified for the position. *See Provenzano*, 663 F.3d at 814. Therefore, the Court finds Carter satisfied the last prong of a *prima facie* case of age discrimination.

For the foregoing reasons, the Court concludes that Carter has produced sufficient evidence for a reasonable finder of fact to conclude he has satisfied his *prima facie* burden.

### 2. Legitimate Non-Discriminatory Reason

Once an employee has established a *prima facie* case of age discrimination, "the burden of production shifts to the employer to articulate a legitimate nondiscriminatory reason for failing to promote the plaintiff to the position sought." *Provenzano*, 663 F.3d at 814. To satisfy this burden, the City need only "raise a genuine issue of fact as to whether it discriminated against" Carter. *See id.* at 814-15. To do this, the City "must clearly set forth, through the introduction of admissible evidence, the reasons for not promoting" Carter. *See id.* at 815.

The City asserts that it promoted Walters instead of Carter because Walters was "the most qualified candidate for the position." Doc. No. 45 at PageID 742. The City explains that Walters "was proficient with most of the required machinery and skills and was already a laborer in the Street Department" while Carter "had little to no previous Street Department experience and was only proficient with some of the required machinery and skills." *Id.* The City provided evidence of this reasoning through the deposition of Mullins—the Street Department foreman who sat in on candidate interviews—and exhibits showing the checklists of equipment each candidate had operated. Doc. No. 49 at PageID 942-959, 1015; Doc. No. 49-2 at PageID 1148-59. Therefore, the City has met its burden of production to articulate a legitimate, nondiscriminatory reason for

13

not promoting Carter. *See Provenzano*, 663 F.3d at 815 (concluding that the employer had met its burden of production by asserting that it chose not to promote the plaintiff "because it decided to promote a more qualified candidate" and by providing a deposition and affidavit of a manager's description of the candidates' performance-related attributes and deficiencies).

### 3. Pretext

After "an employer offers nondiscriminatory reasons for an adverse employment action, the burden shifts back to the employee to prove that the stated reason for [his] termination is pretextual." *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012). Unlike the "light review" of qualifications at the prima facie stage, a "more rigorous comparison [must be] conducted at the later" pretext stage of the analysis. *Provenzano*, 663 F.3d at 814. This is especially important "where the employer asserts as its nondiscriminatory reason for failing to promote the plaintiff that it chose to hire a candidate it considered more qualified." *Id.* "A plaintiff can refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Id.* at 815 (internal quotation marks omitted).

Carter's grounds for finding pretext appear to be that he believes he was more qualified for the promotion than Walters. Doc. No. 53 at PageID 1341. The relative qualifications of candidates "establish triable issues of fact as to pretext where the evidence shows that either (1) the plaintiff was a plainly superior candidate, such that no reasonable employer would have chosen the [promoted employee] over the [plaintiff], or (2) plaintiff was as qualified as if not better qualified than the successful applicant, and the record contains other probative evidence of discrimination." *Provenzano*, 663 F.3d at 815 (citing *Barlett v. Gates*, 241 Fed. App'x 485, 490-91 (6th Cir. 2010))

14

(internal quotation marks omitted). Neither showing has been made here.

First, Carter fails to show that he was the "plainly superior candidate" when compared to Walters, such that no reasonable employer would have chosen Walters over Carter. *See id.* Carter asserts that Walters could not be qualified for the position because his application was incomplete and did not "satisfy the mandatory requirements for the position" by not including a resume and certification of a tanker endorsement, whereas Carter's application was complete. Doc. No. 53 at PageID 1341. However, "an employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext." *Miles*, 946 F.3d T 896 (citing *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005)) (internal quotation marks omitted). The Sixth Circuit has found that "irregularities in a company's interview process alone do not constitute pretext sufficient to overcome summary judgment" unless the plaintiff "show[s] how the irregularities prejudiced him in the selection process or indicate any dishonesty or bad faith on behalf of" the employer. *Stokes v. Detroit Pub. Schs.*, 807 Fed. App'x 493, 501 (6th Cir. 2020). In other words, an employer's irregularities in the application process alone do not automatically establish pretext; the plaintiff must also show other probative evidence of discrimination. *See id.*; *Provenzano*, 663 F.3d at 815. Here, although Walters did not officially submit a complete application, the City—specifically the Street Department—already had knowledge of Walters' qualifications and tanker endorsement because he worked for the Street Department. Doc. No. 49 at PageID 959. Even Carter himself knew that Walters had a tanker endorsement. Doc. No. 49 at PageID 1208. Therefore, the fact that Walters did not submit a completed application prior to his interview does not automatically establish pretext.

Carter also claims that his prior experience and fourteen years of service with the City made him more qualified for the promotion than Walters. Doc. No. 53 at PageID 1344. However,

"a plaintiff's subjective assessment of his qualifications alone does not show pretext." *Stokes*, 807 Fed. App'x at 502. Additionally, more years of experience does not necessarily mean that a candidate is more qualified for a promotion. *See id.*

Here, as explained above, Carter was employed with the City in the Parks Department for fourteen years, had experience with "two-thirds" of the machinery or skills listed for the LEO position, and submitted a complete application for the LEO position. Doc. No. 50 at PageID 1208, 1223, 1171; Doc. No. 53 at PageID 1348. Walters had been employed with the City in the Street Department for approximately one year, had prior experience at a different municipality, had operated twenty-three of the twenty-five machines or skills listed for the LEO position, and submitted an incomplete application for that position. Doc. No. 47 at PageID 764; Doc. No. 49-2 at PageID 1159; Doc. No. 53 at PageID 1349. Both Carter and Walters had a tanker's license. Doc. No. 50 at PageID 1208. Under these circumstances, "a reasonable decisionmaker could find that [Walters] was better suited for the job" because he had been working within the Street Department and had experience with more of the equipment that the employer found relevant for the position. *See Stokes*, 807 Fed. App'x at 502. Therefore, Carter fails to show that he was the plainly superior candidate when compared to Walters, such that no reasonable employer would have chosen Walters over Carter.

Second, even if Carter were as qualified as—or better qualified than—Walters for the promotion, Carter does not point to other probative evidence of discrimination in the record. *See Provenzano*, 663 F.3d at 815. Carter claims that "the list of pieces of equipment listed for the job had been updated shortly before the posting and interviews." Doc. No. 17-1 at PageID 75. Carter speculates that changes to the list "were developed specifically to give Brendon Walters [an] advantage" over him and that "[m]any of the pieces of equipment on the list are not even operated

by the LEO." *Id.*; *see also* Doc. No. 26 at PageID 124. However, Carter provides no evidence—beyond his mere speculation—as to how updating this list of equipment prior to publishing the job posting was a pretext for age discrimination. *See* Doc. No. 53 at PageID 1340.

Carter also asserts that "Mullins made several references questioning Carter's date of retirement[,]" including during Carter's interview for the promotion. *Id.* at PageID 1344. Nevertheless, references to retirement alone do not establish pretext. *See Hale v. ABF Freight Sys., Inc.*, 503 Fed. App'x 323, 331 (6th Cir. 2012) (concluding that "a standalone reference to retirement does not necessarily invoke age"). When deciding whether to hire or promote candidates, "employers can inquire into applicants' commitment to a job without intending to discriminate against older applicants." *Leisring v. Clerk of Hamilton Cnty. Mun. Ct.*, 838 Fed. App'x 956, 961 (6th Cir. 2020). Specifically, the Sixth Circuit has affirmed summary judgment against a plaintiff where the employer repeatedly asked the plaintiff about his plans for retirement to the point where plaintiff felt pressured to retire. *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997).

Here, Carter claims that Mullins—in his interview—asked him how much longer he was going to work before he retired, and Carter responded, "I don't know, maybe five years." Doc. No. 50 at PageID 1216-17. Carter then claims that Mullins replied: "if you make it that long." *Id.* at PageID 1217. While Carter also asserts in his opposition memorandum that "Mullins made several references questioning [my] date of retirement," Carter does not point to any evidence about any other specific instances of these comments or explain this alleged pattern of behavior. Doc. No. 53 at PageID 1344. The only evidence Carter provides is that Mullins admits, in his deposition, that he has asked Carter about his plans for retirement in the past. Doc. No. 49 at PageID 1021. Mullins explained that "[Carter] would bring it up that he wanted to retire[;] he

17

wanted to retire early" and Mullins would regularly ask retirement-eligible persons when they were going to retire as a general topic of conversation. *Id.* at PageID 1021. However, Carter does not explain how any of these references to Carter's retirement differ from the established Sixth Circuit precedent indicating that this behavior does not automatically establish pretext. *See* Doc. No. 53.

Therefore, even when viewed in the light most favorable to Carter, no evidence suggests that the City's proffered legitimate, nondiscriminatory reasons for failing to promote him either lacked a basis in fact, did not actually motivate the decision, or were insufficient to motivate the decision. Because Carter "has not established a genuine dispute of material fact that age discrimination was the 'but-for' cause of" the City's decision to promote Walters instead of Carter, the Court will grant the City's motion for summary judgment on this claim. *See Provenzano*, 663 F.3d at 818.

### B. ADEA and Ohio Law Retaliation Claims

Carter next asserts that the City retaliated against him because he filed an EEOC charge of discrimination on April 5, 2019 in violation of the ADEA and Ohio law. Doc. No. 26 at PageID 129. "The ADEA prohibits employers from retaliating against an employee for opposing or reporting age discrimination." *Blizzard*, 698 F.3d at 288. The Sixth Circuit analyzes ADEA and Ohio retaliation claims under the same standards. *Id.* As with a discrimination claim—in the absence of direct evidence of retaliation—courts analyze ADEA retaliation claims using the *McDonnell Douglas* framework. *Longs v. Ford Motor Co.*, 647 F.Supp.2d 919, 932 (W.D. Tenn. 2009) (citing *Imwalle v. Reliance Medic. Prod., Inc.*, 515 F.3d 531, 544 (6th Cir. 2008)).

To prove a *prima facie* case of retaliation under the ADEA, Carter "must show that (1) [he] engaged in a protected activity, (2) the defending party was aware that the [plaintiff] had engaged

18

in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and [the] adverse employment action." *Id.* (internal quotation marks omitted). If Carter prevails on his *prima facie* case, "the burden of production shifts to the defendant to 'offer a non-[retaliatory] reason for the adverse employment action.'" *Id.* (quoting *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009)). If the City meets its burden, Carter must then demonstrate that the City's proffered reason was pretext for retaliation. *Id.*

Here, the City asserts that Carter does not satisfy his *prima facie* case of retaliation. Doc. No. 45 at PageID 745. Even if Carter satisfies his *prima facie* case, the City argues it has offered a legitimate non-retaliatory reason for each of its actions and contends that Carter cannot show the City's reasoning was pretextual. *Id.* at PageID 755. While Carter responds to the City's arguments concerning the *prima facie* case, the Court questions whether Carter adequately responds to the City's arguments regarding the City's legitimate non-retaliatory reason or the potential that this reasoning is pretextual. *See* Doc. No. 53 at PageID 1349-50. As explained above, Carter does not mention the word "pretext" in his summary judgment opposition memorandum. *See id.* Accordingly, Carter may have abandoned his federal and state retaliation claims and waived any argument concerning dismissal of the claims. *See Hicks*, 449 Fed. App'x at 487.

Additionally, Carter fails to point to specific evidence when asserting crucial points in his opposition memorandum. *See, e.g.,* Doc. No. 53 at PageID 1344 (indicating a meeting occurred on January 21, 2020, but failing to cite to evidence supporting this date). The non-moving party cannot rest on the pleadings and cannot expect the Court to search the entire record for material facts. *Viergutz*, 375 Fed. App'x at 485; *Guarino*, 980 F.2d at 404. Thus, summary judgment on the retaliation claim is appropriate on this independent basis.

19

Moreover, Carter did not allege or show that he filed a second EEOC charge containing allegations of retaliation. *See generally* Doc. Nos. 26, 53. Typically, "[e]ach incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable unlawful employment practice[,]" and each of these actions must be associated with an EEOC charge. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002) (internal quotation marks omitted). However, the Sixth Circuit has held that a second administrative charge to claim retaliation is not always necessary when the alleged retaliation is adequately related to the first discrimination charge. *Delisle v. Brimfield Twp. Police Dep't*, 94 Fed. App'x 247, 254 (6th Cir. 2004). Even so, the Court questions whether Carter's retaliation claims are sufficiently related to the original EEOC charge to negate the filing of a separate charge, and Carter does not explain why a second EEOC charge was not filed. *See* Doc. No. 53.

Nonetheless, the Court will review the merits of Carter's retaliation claim under the *McDonnell Douglas* burden-shifting analysis.

### 1. *Prima Facie* Case of Retaliation

The City concedes that Carter satisfies the first prong, *i.e.*, that he engaged in a protected action by filing the EEOC charge and this lawsuit. Doc. No. 45 at PageID 746. Thus, the Court examines the second, third, and fourth prongs.

### a. Knowledge of the Protected Activity

To satisfy the second prong, Carter must show Drake knew that he had filed the EEOC charge or this lawsuit before taking adverse action against him. *See Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002). The Sixth Circuit has held that to establish the second prong, a plaintiff must produce non-speculative "evidence sufficient to establish that the individuals charged with taking the adverse employment action knew of the protected activity." *Id.*; *see also Crane v. Mary*

*Free Bed Rehab. Hosp.*, 634 Fed. App'x 518, 526-27 (6th Cir. 2015) (holding that the plaintiff did not establish that a supervisor who took the adverse employment action knew of the protected activity when (1) the plaintiff only provided evidence that the supervisor talked with others who knew of the protected activity, (2) the plaintiff "presented no non-speculative evidence that" the supervisor knew about the protected activity before taking the adverse action, and (3) the supervisor testified that she did not know of the protected activity).

Here, Carter testified that he was "sure [Drake] was" aware that he filed the EEOC charge because "the City of Troy is not that big" and "people know everything, especially if you're a manager." Doc. No. 50 at PageID 1251. Carter also testified that he brought up filing the charges with the EEOC to Drake at a meeting. *Id.* at PageID 1280-81. In his opposition memorandum, Carter states that this meeting occurred on January 21, 2020. Doc. No. 53 at PageID 1344. However, Carter does not point to anything in the record that verifies this date. *Id.* Additionally, Drake testified that he did not know when he learned of the EEOC charge and that he did not recall a meeting with Carter. Doc No. 48 at PageID 808-10.

Even viewing the evidence in the light most favorable to the plaintiff, a reasonable trier of fact could not conclude that Drake learned of the EEOC charge at any specific time before he took any alleged adverse actions against Carter. *See Mulhall*, 287 F.3d at 552. Because Carter cannot point any non-speculative evidence in the record as to when Drake became aware of the EEOC charge or lawsuit, he cannot show that Drake retaliated against him. *Id.* Therefore, Carter fails to satisfy the second prong of his *prima facie* case. This justifies the granting of summary judgment on the ADEA retaliation claim in favor of the City. Although the Court's analysis on this claim can thus end here, the Court will proceed to review the remaining two *prima facie* prongs.

### b.  Adverse Employment Action

To satisfy the third prong, Carter must show that the City took "a materially adverse action" against him.  See *Blizzard*, 698 F.3d at 290.  "An adverse action is material if it 'would dissuade[] a reasonable worker from making or supporting a charge of discrimination.'"  *Id.* (quoting *Lahar v. Oakland Cnty.*, 304 Fed. App'x 354, 357 (6th Cir. 2008)).  Typically, a materially adverse employment action involves "a change in pay, benefits, seniority, rank, or job status."  *Blackburn v. Shelby Cnty.*, 770 F.Supp.2d 896, 925 (W.D. Tenn. 2011).

Carter alleges four adverse actions in his amended complaint.  Doc. No. 26 at PageID 129.  First, Carter asserts in his opposition memorandum that in January 2020, "Drake retroactively lowered [his] performance evaluation scores […] on [his] 2018 and 2019 performance evaluations[] without any explanation."  Doc. No. 53 at PageID 1345.  However, the evidence Carter cites shows that this statement is inaccurate.  The record shows that Drake did not retroactively change Carter's scores; instead, Drake gave Carter lower scores in 2019 than in 2018.  Doc. No. 48 at PageID 824-25; Doc. No. 48-4 at PageID 910-14.  Specifically, several of Carter's scores decreased from a "4," indicating the employee "exceeds" expectations, to a "3," indicating the employee "meets" expectations.  Doc. No. 48-4 at PageID 912, 914.  Generally, a negative employment evaluation is not a material adverse action "unless it 'significantly impact[s] an employee's wages or professional advancement.'"  *Blackburn*, 770 F.Supp.2d at 925 (quoting *James v. Metro. Gov't of Nashville*, 243 Fed. App'x 74, 79 (6th Cir. 2007)).

Here, Carter only shows that Drake lowered some of his performance evaluation scores from "exceeds" expectations in 2018 to  "meets" expectations in 2019.  Doc. No. 48-4 at PageID 912, 914.  Carter does not allege or explain any adverse consequences that he suffered because of

the lower score. *See* Doc. No. 53. Therefore, Carter has not shown that this performance evaluation is a materially adverse action.

Second, Carter alleges that Drake gave him fewer "upgrade" and overtime hours than younger peers. Doc. No. 26 at PageID 129. Carter's claim about "upgrade" hours is unsupported by the evidence because "upgrade" hours were eliminated by 2019 when Carter filed his EEOC charge. Doc. No. 47 at PageID 766-67; Doc. No. 50 at PageID 1185-86. Therefore, Carter cannot show that any other employee received more "upgrade" hours than he did after filing the EEOC charge or lawsuit because "upgrade" hours had been eliminated.

However, Carter's claims regarding overtime hours are supported by the evidence. Drake admitted that he called in two other employees to handle the tornado incident instead of Carter when Carter was supposed to be given priority. Doc. No. 48 at PageID 833-35. As a result, Carter did not receive as many overtime hours or pay that he would have received had he been called. *Id.* at PageID 835. Viewed in the light most favorable to Carter, a reasonable trier of fact could conclude that Drake's action regarding tornado cleanup in January 2020 was a material adverse action that resulted in Carter receiving less pay. *See Blackburn*, 770 F.Supp.2d at 925.

Third, Carter asserts that Drake used verbal and non-verbal communication to retaliate against him. Doc. No. 26 at PageID 129. Carter alleges three instances of such retaliation set forth above. *See supra* p. 6. However, the Sixth Circuit has clarified that verbal warnings are insufficient to show a material adverse employment action. *Finley v. City of Trotwood*, 503 Fed. App'x 449, 454 (6th Cir. 2012). Additionally, courts typically find that actions such as embarrassing, criticizing, irritating, yelling at, and directing profanity at a plaintiff do not constitute material adverse actions. *See, e.g., Benitez v. Tyson Fresh Meats, Inc.*, No. 3:18-cv-491, 2022 WL 1283087 at *72-73 (listing and summarizing cases where supervisors have minor

conflicts with plaintiffs alleging retaliation). Therefore, Carter cannot show that the warnings amounted to a material adverse action.

Finally, Carter alleges that Drake required Carter to do more physically taxing work than his peers. Doc. No. 26 at PageID 129. "A reassignment, a negative public perception concerning a transfer or a particular job, a transfer to a position with different responsibilities, semantic changes in title, and the bruising of an ego [do] not, without more, rise to the level of 'materially adverse changes' in the terms of employment[,]" even if this makes the plaintiff's job more difficult. *Blackburn*, 770 F.Supp.2d at 925 (citing *Kocsis v. Multi-Care Mgt., Inc.*, 97 F.3d 876, 885-87 (6th Cir. 1996)). Carter testified that at one point he "was taken off [his] regular job [he has] been doing for seven years"—running a Bobcat and doing tree work—and put on trash and restroom duty. Doc. No. 50 at PageID 1266. Carter testified that, one other time, he was sent to paint barrels, which he claims caused him to get headaches. *Id.* at PageID 1267, 1270. However, Carter's job title and pay were not changed due to these assignments. *Id.* at PageID 1266-67. Carter fails to reference any case law contradicting Sixth Circuit precedent stating that this type of internal reassignment does not constitute a materially adverse employment action. *See* Doc. No. 53. Therefore, Carter has not shown that his job reassignments were materially adverse actions.

Consequently, viewed in the light most favorable to Carter, a reasonable trier of fact could conclude that Drake's action regarding overtime hours was materially adverse. Carter has thus satisfied the third prong of his *prima facie* case with regards to the retaliation claim.

### c. Causation

To satisfy the fourth prong, Carter must establish a causal link between Drake's alleged adverse actions and Carter's EEOC charge. *See Blizzard*, 698 F.3d at 289. "Causation is found where the plaintiff 'proffer[s] evidence sufficient to raise the inference that [the] protected activity

was the likely reason for the adverse action.'" *Lindsay v. Yates*, 578 F.3d 407, 418 (6th Cir. 2009) (quoting *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007)). If an adverse "action occurs very close in time after an employer learns of a protected activity, such temporal proximity" is sufficient to satisfy the causation element of a *prima facie* case of retaliation. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).; *see Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) (finding that two to five months between the protected activity and the adverse action was insufficient to establish causation).

Carter cannot show causation. Carter does not provide any direct evidence that raises the inference that filing the EEOC charge or the lawsuit was the reason for any of the alleged actions. *See* Doc. No. 53 at PageID 1344-46, 1349-50. Carter only alleges that "the proximity and persistence of the adverse employment action to [my] protected activity strongly weighs in favor of a causal connection." *Id.* at PageID 1349-50. Carter filed the EEOC charge on April 5, 2019 (Doc. No. 26 at PageID 123). Even assuming, *arguendo*, that Drake learned of the EEOC charge at the January 21, 2020 meeting, a reasonable trier of fact could not conclude that Carter's only alleged materially adverse action—Drake's denial of tornado cleanup overtime hours—occurred after Drake learned of the charge. In his opposition memorandum, Carter only asserts that the tornado cleanup incident occurred in "January 2020[.]"[4] Doc. No. 53 at PageID 1345. Because the alleged tornado cleanup incident could have occurred before January 21, 2020, Carter cannot prove causation by temporal proximity. Therefore, Carter has thus failed to establish the fourth prong of his *prima facie* case. Summary judgment in the City's favor on the ADEA and Ohio law retaliation claims is thus appropriate on this independent basis.

---

[4] While Carter's opposition memorandum states that the alleged tornado cleanup incident happened in January 2020, the record cite to Carter's testimony indicates that the event could have happened in January 2021.

### 2. Legitimate, Non-Retaliatory Reason

Assuming, *arguendo*, that Carter had established a *prima facie* case, the burden shifts to the City to prove a legitimate, non-retaliatory reason for its actions. *See Blizzard*, 698 F.3d at 288. The City gave explanations for each of the four alleged adverse actions. Doc. No. 45 at PageID 755. First, Drake gave detailed explanations as to why each score on Carter's performance evaluation in 2019 was lower than the past year. Doc. No. 48-4 at PageID 915-17. Second, Drake explained that he called other employees to help with tornado cleanup instead of Carter because they had more experience than Carter with the specific equipment needed for that job. Doc. No. 48 at PageID 835-36. Third, Drake's verbal warnings were given as a result of Carter's unsatisfactory work product or misconduct. Doc. No. 48-5 at PageID 918-21. Finally, the City offered reasons why employees, including Carter, were assigned to trash, restrooms, and painting barrels. Doc. No. 48 at PageID 867; Doc. No. 50 at PageID 1178. Therefore, the City has provided sufficient legitimate, not-retaliatory reasons to satisfy its burden of production.

### 3. Pretext

After the employer provides a legitimate, non-retaliatory reason for its actions, the burden shifts back to plaintiff to show that the proffered reason was pretext for retaliation. *Blizzard*, 698 F.3d at 288. A plaintiff can "show pretext by demonstrating that: '(1) the employer's stated reason […] has no basis in fact, (2) the reason offered […] was not the actual reason for [the adverse action], or (3) the reason offered was insufficient to explain the employer's action." *Spengler v. Worthington Cylinders*, 615 F.3d 481, 493 (6th Cir. 2010). Carter has not come forth with any evidence or arguments disputing the City's proffered reasons for its actions. *See* Doc. No. 53. Carter has thus failed to meet his burden to establish pretext.

Consequently, a reasonable trier of fact "could not find retaliation on these facts, and" summary judgement is proper on both the ADEA and Ohio law retaliation claims. *Mulhall*, 287 F.3d at 554.

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** the City's motion for summary judgment (Doc. No. 45) and **TERMINATES** this case on the docket.

**IT IS SO ORDERED.**

  February 1, 2024                         s/Michael J. Newman\
                                        Hon. Michael J. Newman\
                                        United States District Judge